UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

MARGARET O'CONNOR, )
    Plaintiff )
 )
v. )
 )
JORDAN HOSPITAL, PETER HOLDEN, President and CEO, )
THE BOARD OF DIRECTORS of JORDAN HOSPITAL, )
WILLIAM KIRKWOOD, Vice President of Organizational )
Development, HARVEY KOWALOFF M.D., )
    Defendants )

---

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

The Plaintiff, Margaret O'Connor, brings this action seeking redress for violations of the Emergency Medical Treatment and Active Labor Act 42 U.S.C. 1395dd, the Massachusetts Whistleblower Act M.G.L. c. 149, §185, Massachusetts Healthcare Provider Whistleblower Act M.G.L. c. 149, §187, the Massachusetts Declaration of Rights, the Massachusetts Discrimination Law M.G.L. c 151B, §4, as well as violations of the common law.

### JURISDICTION

Plaintiff asserts federal jurisdiction under 28 U.S.C. § 1331 for the EMTALA claim, and pendent jurisdiction of her state law claims under 28 U.S.C. § 1367.

### PARTIES

1. Plaintiff, Margaret O'Connor, is a resident of Plymouth, County of Plymouth, Commonwealth of Massachusetts. It is further alleged that Ms. O'Connor was at all times pertinent to this complaint a registered nurse and health care provider within the meaning of M.G.L. c. 149, § 187 and 42 U.S.C. 1395dd.

2. Defendant Jordan Hospital (hereinafter referred to as the Defendant "Hospital") is a corporation duly organized under the laws of the Commonwealth of

Massachusetts with a principal place of business at 275 Sandwich Street, Plymouth, County of Plymouth, Commonwealth of Massachusetts.

3. Defendant Peter Holden, M.D. (hereinafter referred to as "Holden") was at all times material to this action a duly licensed physician under the laws of the Commonwealth of Massachusetts. At all times material hereto, Defendant Holden acted in an individual capacity or as an agent, manager, servant or employee of the Defendant Hospital. Upon information and belief, defendant Holden participates in and is responsible for employment related decisions, including the termination of employees.

4. The Defendants, members of The Board of Directors of Jordan Hospital are appointed to manage, control and govern the Jordan Hospital, including decisions regarding termination of Hospital employees.

5. Defendant William Kirkwood, Vice President of Organizational Development, (hereinafter referred to as "Kirkwood") at all times material hereto, acted in an individual capacity or as an agent, manager, servant or employee of the Defendant Hospital.

6. Defendant Harvey Kowaloff, Head of Clinical Reliability, (hereinafter referred to as "Kowaloff") at all times material hereto, acted in an individual capacity or as an agent, manager, servant or employee of the Defendant Hospital.

## FACTS

7. Plaintiff, Margaret O'Connor, had been employed by the Defendant Jordan Hospital for over 38 years as a registered nurse and various other positions relating to quality control.

8. Plaintiff worked as part of the "Hospital's" Human Resources department for twenty-five years.

9. At the time of the incident Plaintiff was supervised by defendant Harvey Kowaloff in the Clinical Reliability Department doing Risk Management.

10. On or about November 10, 2009, Plaintiff received an exemplary performance evaluation from Defendant Kowaloff for her work in Risk Management.

11. On or about 8:00 a.m. on March 26, 2010, Defendant Jordan Hospital received a patient (hereinafter "Patient") in its Emergency Room and assigned her to a nurse practitioner in charge of, and responsible for, the patient's care, treatment and diagnosis. "Patient" was six months pregnant with twins, a diabetic and considered a "high risk" pregnancy.

12. "Patient" complained of abdominal pain and nausea upon presentation to the Emergency Room at the Defendant Jordan Hospital.

13. The attending nurse practitioner diagnosed "Patient's" problem as being a "stomach bug" and sent "Patient" to receive fluids intravenously without further testing, observation, treatment, evaluation or diagnosis.

14. In actuality, "Patient" was in active labor, an emergency medical condition as defined by the Emergency Medical Treatment and Active Labor Act, EMTALA, 42 U.S.C. §1395dd.

15. Two hours after her admission and after continually complaining about her abdominal pain, "Patient" was diagnosed by the attending nurse practitioner as being in labor.

16. After the above-mentioned diagnosis was made, "Patient" requested and was ultimately transferred to South Shore Hospital.

17. At approximately 10:20 a.m. "Patient" was transferred from Defendant Jordan Hospital without an attending physician from Jordan Hospital's approval. At no point prior to "Patient's" transfer had any doctor diagnosed the patient as being in a stable condition sufficient to be safely transferred to another hospital, in clear violation of the EMTALA statute.

18. "Patient" was subsequently treated by South Shore Hospital where, upon arrival, she had one of her child's legs protruding into her vagina. An emergency Caesarian Section was done. The second child delivered also experienced significant complications during labor.

19. Two days after the aforementioned incident, Plaintiff received a telephone call from the South Shore Hospital's Risk Manager, who voiced serious concern about the "Patient" transfer that had occurred two days prior.

20. The South Shore Hospital's Risk Manager stated to Plaintiff "Do you people have doctors over there? I hope this isn't an EMTALA violation". The South Shore Hospital's Risk Manager went on to explain that her hospital had received a transfer from Jordan Hospital's facility without having been seen by a physician and the patient was extremely unstable. She had delivered two premature infants and suffered a partial abruption of the placenta, one baby had ingested blood into the lungs and was intubated and on a respirator.

21. Plaintiff had no prior knowledge of the incident, but told the South Shore Hospital's Risk Manager she would do a complete investigation and get back to her as soon as possible.

22. Plaintiff conducted a thorough investigation which included speaking with the department director of two departments in which this patient was seen; the Emergency Department as well as the Obstetrics Department.

23. Under EMTALA if there is a recognized unstable medical condition as defined by EMTALA, such as being in active labor, the original admitting hospital is obligated to treat and/or stabilize the emergent medical condition prior to discharging or transferring the patient.

24. Plaintiff immediately realized an EMTALA violation had occurred and reported it to senior management.

25. Plaintiff subsequently spoke with the Jordan Hospital attorney, who advised Plaintiff to "self report" the incident before South Shore Hospital reported it; as mandated as part of the hospital's Centers for Medicare and Medicaid Conditions of Participation.

26. Plaintiff met with Deborah Sullivan, Senior Director of Clinical Reliability and Patient Safety Officer; Harvey Kowaloff M.D. Vice President and Chief Medical Officer; and Peter Holden President and CEO to talk about reporting the violation.

27. At this meeting it was discussed why the offense was reportable and to whom and what the penalties were for a violation.

28. While at the meeting Defendant Kowaloff went on the internet and researched penalties and fines for EMTALA violations. Dr. Kowaloff informed Peter Holden that there was a $50,000.00 fine per EMTALA violation. Mr. Holden stated to Plaintiff that he was "not telling you (Plaintiff) not to report it, but let's make sure we need to."

29. Plaintiff explained that the Hospital was required by law to report the incident and would be at greater risk if South Shore Hospital reported the incident first.

30. Plaintiff explained that the hospital attorney also believed they should self report.

31. At the time, this was Jordan Hospital's first known EMTALA violation. Plaintiff then solicited help from the attorney to summarize the events and complete the report.

32. Plaintiff subsequently met with Deborah Sullivan and Harvey Kowaloff to complete the action plan and get approval of all senior management before its submission.

33. Plaintiff then contacted South Shore Hospital's Risk Manager to advise her that Jordan Hospital was self reporting.

34. Three days following the submission of the report Jordan Hospital received a survey from the Department of Public Health who acts on behalf of Centers for Medicare and Medicaid to investigate EMTALA violations.

35. The investigation lasted five days, and involved a thorough and in-depth look at the policies, protocols and procedures of Jordan Hospital, including but not limited to, an audit of all past patient transfers to other hospitals.

36. The results of the survey were damaging to the Jordan Hospital and multiple violations were found to have existed in both the Obstetrics and the Emergency Department. The report concluded that there had been as many as four prior EMTALA violations, not including the incident which caused the original investigation.

37. Pursuant to the EMTALA statute, the potential penalty to be imposed for the five violations would total $250,000 in fines.

38. The final report from the Department of Public Health outlined major deficiencies in education of staff regarding EMTALA, hospital policies not in place or not followed, signage not available and the documentation of the risks and benefits of transfers were never made available to patients.

39. Plaintiff immediately began working on the education, policy creation, bylaw revision, and signage issues raised by the Department of Public Health.

40. As a result of the EMTALA report filed by Plaintiff, the Defendant Hospital was required to complete a validation survey from Centers for Medicare and Medicaid which was known to be an intense and concerning process.

41. A department director asked Plaintiff after a meeting why the hospital had to report the incident when the medical outcome was satisfactory and all three patients(mother and twins) were doing well.

42. At various times Plaintiff stated her intentions to inform "Patient" about the EMTALA violation once the investigation was completed by the Centers for Medicare and Medicaid.

43. On Wednesday May 19, 2010, twelve CMS regulators arrived to conduct the validation survey as a result of the EMTALA violation reported by Plaintiff.

44. Shortly after the arrival of the CMS regulators, and before Plaintiff was interviewed by any CMS regulators to discuss the EMTALA violation, Plaintiff was asked to meet with William Kirkwood, Vice President of Organizational Development and Harvey Kowaloff, Head of Clinical Reliability.

45. Plaintiff was summarily informed she was being terminated.

46. Dr. Kowaloff informed Plaintiff that the reason for her termination was "regulatory."

## COUNT I
## VIOLATION OF THE EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT, 42 U.S.C. 1395dd

47. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 46, supra.

48. Under EMTALA, a hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or against any hospital employee because the employee reports a violation of a requirement of this section.

49. The defendant, Jordan Hospital, retaliated against Ms. O'Connor for disclosing, objecting to and/or refusing to participate in an activity, policy or practice which Ms. O'Connor reasonably believed was in violation of the Emergency Medical Treatment and Active Labor Act.

50. As a consequence of the defendant Hospital's actions, Ms. O'Connor suffered and continues to suffer damages, including, but not limited to, loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

## COUNT II
## RETALIATION IN VIOLATION OF THE STATE WHISTLEBLOWER STATUTE, G.L.c.149 § 185

51. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 50, supra

52. The defendant, Jordan Hospital, retaliated against Ms. O'Connor for disclosing, objecting to and/or refusing to participate in an activity, policy or practice which Ms. O'Connor reasonably believed was in violation of a law and/or a rule or regulation promulgated by law, in violation of the Massachusetts Whistleblower statute, G.L.c.149 §185.

53. The defendant, Jordan Hospital, manifested this retaliation against Ms. O'Connor after her whistle blowing activities by, inter alia, ordering her to take on additional responsibilities and, ultimately, terminating her for reporting a violation of EMTALA.

54. As a consequence of the defendant Hospital's actions, Ms. O'Connor suffered and continues to suffer damages, including but not limited to: loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

## COUNT III
## RETALIATION IN VIOLATION OF THE HEALTHCARE PROVIDER WHISTLEBLOWER STATUTE, G.L.c.149 § 187

55. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 54, supra.

56. At all times relevant herein, Jordan Hospital were/are "Health Care Facilities," as that term is defined by this statute.

57. At all times relevant herein, Ms. O'Connor was/is a "Health Care Provider," as that term is defined by this statute.

58. At all times relevant herein Defendants, Peter Holden, William Kirkwood and Harvey Kowaloff, were/are "Managers," as that term is defined by this statute.

59. Through their above conduct, Defendants retaliated against Ms. O'Connor for engaging in conduct set forth in sub-part (b) of this statute.

## COUNT IV
## VIOLATION OF ARTICLE 10 OF THE MASSACHUSETTS DECLARATION OF RIGHTS

60. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 59, supra.

61. Article 10 of the Massachusetts Declaration of Rights provides that no citizen of Massachusetts may be deprived of the enjoyment of his or her property without due process of law.

62. Ms. O'Connor possessed a property interest in her continued employment. By depriving Ms. O'Connor of her position without cause and without due process of law, defendants violated Article 10 of the Massachusetts Declaration of Rights.

63. As a consequence of the defendants' actions, Ms. O'Connor suffered and continues to suffer damages, including but not limited to: loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, , and emotional and mental distress.

## COUNT V
## VIOLATION OF ARTICLE 16 OF THE MASSACHUSETTS DECLARATION OF RIGHTS

64. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 63, supra.

65. Article 16 of the Massachusetts Declaration of Rights provides that the rights of Massachusetts citizens to freedom of speech shall not be abridged.

66. Ms. O'Connor was discharged in retaliation for speaking out about matters of public concern in violation of Article 16 of the Massachusetts Declaration of Rights.

67. As a consequence of the defendants' actions, Ms. O'Connor suffered and continues to suffer damages, including but not limited to: loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

## COUNT VI
## RETALIATION (G.L. ch. 151B, §§4(4) and 4(4A))

68. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 67, supra.

69. Jordan Hospital illegally retaliated against Mrs. O'Connor for engaging in protected activities. Jordan Hospital also attempted to coerce, intimidate, threaten and interfere with Mrs. O'Connor's exercise of her rights granted or protected by Massachusetts General Laws chapter 151 B. This conduct violates Massachusetts General Laws Chapter 151 B, §§ 4(4) and 4(4A).

70. As a result of the above described actions, Mrs. O'Connor has suffered substantial damages, including lost salary and benefits, damage to her career, and emotional distress.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY DEFENDANT

71. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 70, supra.

72. Defendant's conduct of retaliating against Plaintiff and retaliating against her was extreme and outrageous.

73. Defendant knew or should have known that this extreme and outrageous behavior would cause Plaintiff to suffer severe emotional distress.

74. Plaintiff has suffered severe emotional distress as a result of the Defendants' extreme and outrageous conduct.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY DEFENDANT

75. Ms. O'Connor hereby restates and incorporates by reference Paragraphs 1 – 74, supra.

76. Defendant's conduct of retaliating against Plaintiff and retaliating against her was extreme and outrageous.

77. A reasonable and prudent business in the same or similar circumstances as Defendant would know or should have known that Plaintiffs emotional distress was a foreseeable result of this extreme and outrageous conduct.

78. Plaintiff has suffered severe emotional distress as a result of the Defendants' extreme and outrageous conduct.


THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.
WHEREFORE, the Plaintiff, Margaret O'Connor, respectfully requests that this Court:

1. Enter judgment in her favor on each Count of this Complaint;

2. Reinstate the Plaintiff to the position which she previously held with the Defendant;

3. Award her compensatory damages, including, but not limited to, loss of pay and emotional distress damages;

4. Award the Plaintiff her costs and attorneys' fees;

5. Award the Plaintiff multiple and/or punitive damages; and

6. Award the Plaintiff such other relief as this Court deems just, equitable and appropriate.

Respectfully submitted,
For Margaret O'Connor
By her attorney,

LAW OFFICES OF TIMOTHY M. BURKE

_____
Timothy M. Burke BBO # 065720
160 Gould Street, Suite 111
Needham, MA 02494-2300
(781) 455-0707