UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARGARET O'CONNOR,
        Plaintiff,

                                    CIVIL ACTION NO.
        v.                          10-11416-MBB


JORDAN HOSPITAL, PETER HOLDEN,
President and CEO, DEBORAH SULLIVAN,
WILLIAM KIRKWOOD, Vice President
of Organizational Development, and
HARVEY KOWALOFF, M.D.,
        Defendants.


**MEMORANDUM AND ORDER RE:
DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT
(DOCKET ENTRY # 47)**

**May 16, 2012**

**BOWLER, U.S.M.J.**

        Pending before this court is a motion to dismiss the amended

complaint filed under Rule 12(b)(6), Fed. R. Civ. P. ("Rule

12(b)(6)"), by defendants Jordan Hospital ("Jordan Hospital");

Peter Holden ("Holden"), President and CEO of Jordan Hospital;

Deborah Sullivan ("Sullivan"), Senior Director of Clinical

Reliability and Patient Safety Officer; William Kirkwood

("Kirkwood"), Vice President of Organizational Development; and

Harvey Kowaloff, M.D. ("Kowaloff"), Vice President and Chief

Medical Officer (collectively "defendants").  (Docket Entry #

47).  Plaintiff Margaret O'Connor ("plaintiff") opposes

dismissal.  (Docket Entry # 50).  Defendants filed a response to

plaintiff's opposition.  (Docket Entry # 52).  Having heard oral

argument on March 29, 2012, this court took the motion (Docket

Entry # 47) under advisement.


PROCEDURAL BACKGROUND

Plaintiff filed the original complaint (Docket Entry # 1) on

August 7, 2010, against Jordan Hospital, Holden, Kirkwood,

Kowaloff and the Board of Directors of Jordan Hospital ("Board of

Directors") (collectively "the original defendants").  The eight

count original complaint sets out claims against Jordan Hospital

for violation of the Emergency Medical Treatment and Active Labor

Act, 42 U.S.C. § 1395dd ("EMTALA") (Count I); retaliation in

violation of Massachusetts General Laws chapter 149, section 185

("the state whistleblower statute") (Count II); and retaliation

in violation of Massachusetts General laws chapter 151B, sections

4(4) and 4(4)(A) ("chapter 151B") (Count VI).  The original

complaint also sets out claims against the original defendants

for retaliation in violation of the Healthcare Provider

Whistleblower Statute, Massachusetts General Laws chapter 149,

section 187 ("HPWS") (Count III); violation of Article 10 of the

Massachusetts Declaration of Rights ("Article 10") (Count IV);

violation of Article 16 of the Massachusetts Declaration of

Rights ("Article 16") (Count V); intentional infliction of emotional distress (Count VII) and negligent infliction of emotional distress (Count VIII).

On November 3, 2010, Jordan Hospital filed a motion to dismiss (Docket Entry # 9) all counts in the original complaint. On that same date, Holden, Kirkwood, Kowaloff and the Board of Directors (collectively "individual defendants"), filed a separate motion to dismiss. (Docket Entry # 7). In the individual defendants' supporting memorandum (Docket Entry # 8), which incorporated Jordan Hospital's memorandum of law (Docket Entry # 10) by reference (Docket Entry # 7, p. 1), the individual defendants opposed all eight counts of the original complaint.[1] (Docket Entry # 7, pp. 1-2).

On December 13, 2010, the district judge heard oral argument on the motions to dismiss (Docket Entry ## 7 & 9).[2] Addressing plaintiff's counsel at the outset of the hearing, the following colloquy took place:

> THE COURT: Now, this isn't your motion but let me start with you. If I allowed you to go forward against, in spite of this motion to dismiss, as to Count I, the violation of

---

[1] Counts I, II and VI of the original complaint only refer to Jordan Hospital as opposed to any other defendant. (Docket Entry # 1, pp. 6 & 8). The individual defendants in their motion to dismiss, however, treat all eight counts as brought against all defendants. (Docket Entry # 7, pp. 1-2) ("[p]laintiff's complaint fails to state a claim for relief for any of its eight counts, and further attempts to allege claims that are inapplicable to the parties or otherwise precluded").

[2] At the same hearing, the parties consented to a reassignment of the case to this court.

EMTALA, and Count III, the alleged violation of the Mass. [H]ealth [C]are Providers Act, but dismissed the rest of it, you're okay with that, aren't you?

[Plaintiff's counsel]: You beat me to the punch, Judge.

THE COURT: All right.

[Plaintiff's counsel]: I had a conference outside. And I just informed counsel[3] that we're going to tell you that our intention is to dismiss anything else.

THE COURT: Anything else.

[Plaintiff's counsel]: Counts I and III.

THE COURT: Right. Counts I and III seem to make it. Why shouldn't they? You're okay?

[Defendants' counsel]: I'm okay with the dismissal of the others but --

(Docket Entry # 32, p. 3). The court then proceeded to hear argument on counts I and III and denied Jordan Hospital's motion to dismiss as to counts I and III.

The court note reflects a ruling to accept plaintiff's voluntary dismissal of the individual defendants and to allow Jordan Hospital's motion to dismiss on the merits except as to counts I and III. The court note of the hearing reads:

Motion Hearing held on 12/13/2010 re 9 MOTION to Dismiss *Plaintiff's Complaint* filed by Jordan Hospital, 7 MOTION to Dismiss *Plaintiff's Complaint* filed by Harvey Kowaloff, M.D., The Board of Directors of Jordan Hospital, William Kirkwood, Peter Holden. The plaintiff informs the court that these parties are voluntarily dismissed and the Court rules finding as moot 7 Motion to Dismiss; After hearing the Court rules granting in part and denying in part 9 Motion to

---

[3] Counsel of record for defendants has not changed during the course of the case.

Dismiss; Denied as to Counts 1,3, allowed as to all other counts.[4]

On December 9, 2011, plaintiff filed a motion to amend the complaint. (Docket Entry # 36). Jordan Hospital opposed the motion. (Docket Entry # 42). On January 18, 2012, this court held a hearing and allowed the motion to amend (Docket Entry # 36) based on "an abundance of fairness to the plaintiff."[5] (Docket Entry # 46, p. 10).

The amended complaint sets out claims against Jordan Hospital, Holden, Kirkwood and Kowaloff, all of whom were named defendants in the original complaint, and against Sullivan, who was not named as a defendant in the original complaint. (Docket Entry # 44). A number of the claims are similar to those dismissed by the district judge. The counts in the amended complaint are as follows: (1) a violation of EMTALA against all defendants[6] ("EMTALA claim") (Count I); retaliation in violation

_____

[4]  Jordan Hospital contends that the court note does not accurately reflect the district judge's ruling. Jordan Hospital submits that the district judge dismissed the individual defendants.

[5]  In opposition (Docket Entry # 42) to the motion to amend (Docket Entry # 36), Jordan Hospital made a brief futility argument (Docket Entry # 42, p. 11) but did not present the futility argument during the January 18, 2012 hearing.

[6]  Count I in the amended complaint only refers to Jordan Hospital as opposed to any other defendant. (Docket Entry # 44). Plaintiff's brief, however, clarifies that Count I is also brought against Holden, Kirkwood, Kowaloff and Sullivan (collectively "new individual defendants"). Defendants also treat Count I as brought against the new individual defendants. (Docket Entry # 48, p. 12). Accordingly, out of an abundance of caution, this court will consider this count as brought against all defendants.

of HPWS against all defendants ("HPWS claim") (Count II); a violation of Article 10 against all defendants ("Article 10 claim") (Count III); a violation of Article 16 against all defendants ("Article 16 claim") (Count IV); intentional infliction of emotional distress against all defendants (Count V); and negligent infliction of emotional distress against all defendants (Count VI).[7]

On March 29, 2012, this court held a hearing on the motion to dismiss the amended complaint (Docket Entry # 47) and took the matter under advisement. During the hearing, defendants' counsel inquired about Jordan Hospital's motion to amend the docket entry for the December 13, 2010 hearing before the district judge. (Docket Entry # 43). In the supporting memorandum, Jordan Hospital argued that this court should correct the docket entry to reflect the district judge's intention "to grant the individual defendants' motion [to dismiss (Docket Entry # 7)] in its entirety, and to grant Jordan hospital's motion [to dismiss

---

[7] The amended complaint does not include the violation of the state whistleblower statute claim and the chapter 151B claim. These claims are not part of the amended complaint. See Kollings v. American Power Conversion Corp., 347 F.3d 11, 16 (1st Cir. 2003) (the plaintiff's omission of claim from amended complaint, which supersedes the original complaint, constitutes abandonment of claim). The amended complaint also fails to name the Board of Directors as a defendant. See Steele v. Turner Broadcasting System, Inc., 746 F.Supp.2d 231, 235 (D.Mass. 2010) ("any defendants listed in the original complaint but not the amended complaint are considered to have been dismissed as parties to the lawsuit").

(Docket Entry # 9),] except as to Counts I and III." (Docket Entry # 43, p. 4, ¶ 12). Specifically, Jordan Hospital requested: (1) "to have that docket entry corrected because it is creating confusion in the case, as set forth below, or (2) in the alternative, to return this limited question to [the district judge] so he may clarify his intent, to the extent the Court deems that necessary." (Docket Entry # 43, p. 1). Pointing out that plaintiff did not file an opposition to the motion to amend the docket entry, this court allowed the motion (Docket Entry # 43) in open court at the March, 29, 2012 hearing.

### STANDARD OF REVIEW

"To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'" Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008) (quoting Bell Atlantic v. Twombly, 550 U.S. 554, 555 (2007)). While "detailed factual allegations" are not required, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement for relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic v. Twombly, 550 U.S. at 555; Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009); Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008). Additionally, "a well-pleaded complaint may

succeed even if . . . actual proof of those facts is improbable."
Bell Atlantic v. Twombly, 550 U.S. at 556.

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court "accept[s] as true all well pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiffs." Gargano v. Liberty International Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). Eschewing reliance on "'bald assertions, . . . unsubstantiated conclusions,'" Fantini v. Salem State College, 557 F.3d 22, 26 (1st Cir. 2009), and legal conclusions, see Dixon v. Shamrock Financial Corp., 522 F.3d 76, 79 (1st Cir. 2008) (rejecting "'unsupported conclusions or interpretations of law'" in reviewing Rule 12(b)(6) dismissal), the amended complaint sets out the following facts.

## FACTUAL BACKGROUND[8]

Jordan Hospital is a corporation "organized under the laws of the Commonwealth of Massachusetts." (Docket Entry # 44, ¶ 2). The hospital employed plaintiff for over 38 years as a registered nurse and she held "various positions related to quality control." (Docket Entry # 44, ¶ 7). Plaintiff worked in Jordan Hospital's Human Resources Department for 25 years. At the time of her termination, she worked in the Clinical Reliability Department doing risk management ("risk management"). Kowaloff,

---

[8] Citations to the record are provided primarily only for direct quotations.

who supervised plaintiff's work in risk management, gave plaintiff an exemplary performance evaluation on or about November 10, 2009.

In or around late 2009 or early January 2010, the Department of Public Health ("the DPH") conducted an investigation regarding the death of a female patient ("the female patient") treated at Jordan Hospital and issued a report ("DPH report") which was "highly critical of the care" Jordan Hospital provided. (Docket Entry # 44, ¶ 12). In response to the investigation, on or about January 15, 2010, plaintiff drafted a letter from Holden to the patient's son ("the draft letter"). (Docket Entry # 44, ¶ 11).

The draft letter read, "I have to begin by telling you how sorry we are that you lost your mother. This report done by the [DPH] is both upsetting and embarrassing to those of us that work in this hospital, I can't imagine your reaction when you read this." (Docket Entry # 44, ¶ 13). In addition to providing the patient's family with information regarding the DPH report, the draft letter "outlined the process for filing suit and provided information about Jordan Hospital's insurance carrier so that [the parties] could discuss a potential settlement." (Docket Entry # 44, ¶ 15). The draft letter concluded by stating, "Please accept our sincere heartfelt sympathy for the loss of your mother. If there is anything we can do to help you through the grieving process, please contact Ms. O'Connor." (Docket

Entry # 44, ¶ 16).  Plaintiff gave the draft letter to Holden to sign prior to sending it out.  Holden was critical of the letter's content.  (Docket Entry # 44, ¶ 17).  The draft letter "was ultimately not sent to the patient's family."  (Docket Entry # 44, ¶ 17).

"Plaintiff's job responsibilities also included reporting specimen errors" to Clinical Reliability as well as the Patient Care Assessment Committee ("PCAC").  (Docket Entry # 44, ¶ 18). "Through an extensive review process, plaintiff determined that there were at least 100 specimen errors in the Jordan Hospital laboratory per month, including mislabeling of patient biopsies and patient identities."  (Docket Entry # 44, ¶ 19).  "On or about April of 2010, plaintiff formally presented the specimen labeling error information she had gathered to the [PCAC]." (Docket Entry # 44, ¶ 20).  The PCAC "consists of the board of medical staff joint committee and patient care assessment" and includes "members of the Board of Directors."  (Docket Entry # 44, ¶ 22).  Prior to the presentation, Sullivan, plaintiff's supervisor, approved the content and the quality of the presentation.  (Docket Entry # 44, ¶ 21).  Despite that approval, Sullivan criticized plaintiff for the content of the presentation after plaintiff discussed her findings that over 100 specimens were mislabeled per month at Jordan Hospital.  (Docket Entry # 44, ¶ 23).  Holden subsequently told Kowaloff that plaintiff

would "never again" be allowed to present to the PCAC. (Docket Entry # 44, ¶ 24).

At approximately 8:00 a.m. on March 26, 2010,[9] "Jordan Hospital received a patient ("the ER patient") in the emergency room ("ER") and assigned her to a nurse practitioner ("the attending nurse practitioner") in charge of, and responsible for, the patient's care, treatment and diagnosis." (Docket Entry # 44, ¶ 25). The ER patient was "six months pregnant with twins, a diabetic and considered a 'high risk' pregnancy." (Docket Entry # 44, ¶ 25). The ER patient "complained of abdominal pain and nausea upon presentation to the [ER]" at Jordan Hospital. (Docket Entry # 44, ¶ 26). "The attending nurse practitioner diagnosed the [ER patient's] problem as being a 'stomach bug' and sent [the ER patient] to receive fluids intravenously without further testing, observation, treatment, evaluation and diagnosis." (Docket Entry # 44, ¶ 27). The ER patient, however, was actually in active labor.[10] (Docket Entry # 44, ¶ 29). Two

_____

[9] Defendants dispute the date of the incident as March 26, 2010. They submit that the incident took place on March, 15, 2010, as indicated in Jordan Hospital's self-report letter to regulators, signed by Holden. (Docket Entry # 48, p. 3, n.4). For the purpose of reviewing a motion to dismiss, however, this court accepts as true the facts in the amended complaint. See Gargano v. Liberty International Underwriters, Inc., 572 F.3d at 48.

[10] EMTALA defines active labor as an "emergency medical condition." 42 U.S.C. 1395gg ("'emergency medical condition' means . . . (B) with respect to a pregnant woman who is having contractions – (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child").

hours after being admitted into the ER and "after continually complaining about her abdominal pain," the attending nurse practitioner diagnosed the ER patient as "being in labor." (Docket Entry # 44, ¶ 29). After the diagnosis, at the ER patient's request, the ER patient was "ultimately transferred to South Shore Hospital." (Docket Entry # 44, ¶ 30).

At approximately 10:20 a.m., Jordan Hospital transferred the ER patient to South Shore Hospital without any approval from an attending physician at Jordan Hospital. Indeed, no doctor at Jordan Hospital diagnosed the ER patient as being in a sufficiently stable condition "to be safely transferred to another hospital" before Jordan Hospital transferred the ER patient. (Docket Entry # 44, ¶ 31). South Shore Hospital subsequently treated the ER patient. Upon arrival at South Shore Hospital, the ER patient had one of her child's legs protruding into her vagina, so she had to undergo an emergency Caesarian section. The second twin delivered experienced significant complications during labor.

Two days after the incident, "[p]laintiff received a telephone call from South Shore Hospital's risk manager [("SSH risk manager")], who voiced serious concern about the [ER patient's] transfer" to South Shore Hospital. (Docket Entry # 44, ¶ 33). The SSH risk manager asked plaintiff, "Do you people have doctors over there? I hope this isn't an EMTALA violation."

(Docket Entry # 44, ¶ 34).  The SSH risk manager went on to
explain that the ER patient had not been seen by a physician and
"was extremely unstable" when she arrived at South Shore
Hospital.  (Docket Entry # 44, ¶ 34).  The SSH risk manager also
stated that the ER patient "delivered two premature infants and
suffered a partial abruption of the placenta."  (Docket Entry #
44, ¶ 34).  Additionally, South Shore Hospital had to intubate
one of the babies ("the baby") and put the baby on a respirator
because the baby had "ingested blood into the lungs."  (Docket
Entry # 44, ¶ 34).

"Plaintiff had no prior knowledge of the incident but told
the [SSH risk manager] that she would do a complete investigation
and get back to [the SSH risk manager] as soon as possible."
(Docket Entry # 44, ¶ 35).  Plaintiff subsequently "conducted a
thorough investigation[,] which included speaking with the
department director of two departments in which [the ER patient]
was seen," the Emergency Department and the Obstetrics
Department.  Plaintiff realized an EMTALA violation had occurred
("the ER patient EMTALA violation").  (Docket Entry # 44, ¶ 38).

"Plaintiff subsequently spoke with Jordan Hospital['s]
attorney, who advised plaintiff to 'self report' the incident
before South Shore Hospital reported it."  (Docket Entry # 44, ¶
39).  Plaintiff then met with Sullivan, Kowaloff and Holden "to
talk about reporting the violation."  (Docket Entry # 44, ¶ 40).

At this meeting, the participants "discussed why the offense was reportable and to whom and what the penalties were for a violation." (Docket Entry # 44, ¶ 41). During the meeting, "Kowaloff went on the internet and researched penalties and fines for EMTALA violations." (Docket Entry # 44, ¶ 42). Kowaloff informed Holden "that there was a $50,000 fine per EMTALA violation." (Docket Entry # 44, ¶ 42). Holden stated to plaintiff that he was "not telling [plaintiff] not to report it, but let's make sure we need to." (Docket Entry # 42). "Plaintiff explained that [Jordan] Hospital was required by law to report the incident and would be at greater risk if South Shore Hospital reported the incident first." (Docket Entry # 44, ¶ 43). Plaintiff further explained that Jordan Hospital's attorney "also believed that [Jordan Hospital] should self report." (Docket Entry # 44, ¶ 44).

After the meeting with Sullivan, Kowaloff and Holden, plaintiff "solicited help from [Jordan Hospital's] attorney to summarize the events and complete the report" ("plaintiff's report to DPH"). (Docket Entry # 44, ¶ 45). Plaintiff then "met with Sullivan and Kowaloff to complete the report and get approval of all senior management" before submitting it. (Docket Entry # 44, ¶ 46). After that, plaintiff "contacted the [SSH risk manager] to advise her that Jordan Hospital was self reporting." (Docket Entry # 44, ¶ 47).

14

As a result of the report submitted by plaintiff, three days later "Jordan Hospital received a survey ("DPH survey") from [the DPH,] who acts on behalf of the Centers for Medicare and Medicaid [("the CMM")] to investigate EMTALA violations." (Docket Entry # 44, ¶ 48). On Wednesday, May 19, 2010, the DPH sent 12 regulators from the CMM ("CMS regulators") to Jordan Hospital to conduct the DPH survey. (Docket Entry # 44, ¶ 63). The CMS regulators' five day investigation included "a thorough and in-depth look at the policies, protocols and procedures of Jordan Hospital" as well as "an audit of all past patient transfers to other hospitals." (Docket Entry # 44, ¶ 49).

"The results of the [DPH] survey were damaging" to Jordan Hospital. (Docket Entry # 44, ¶ 50). At the time that plaintiff made the report, the incident with the ER patient was the first known EMTALA violation.[11] (Docket Entry # 44, ¶ 45). The DPH survey, however, found that multiple violations existed in both the Obstetrics Department and the Emergency Department. There were "as many as four prior EMTALA violations," not including the ER patient EMTALA violation. (Docket Entry # 44, ¶ 50). Since plaintiff's report to the DPH resulted in the discovery of these costly violations, one department director questioned plaintiff why Jordan Hospital "had to report the incident when the medical

─────────────────

[11] At various times, plaintiff stated her intention to inform the ER patient about the EMTALA violation once the CMM completed the investigation.

outcome was satisfactory and all three patients [(the ER patient and her twins)] were doing well." (Docket Entry # 44, ¶ 55).

The final report from the DPH ("the DPH final report") indicated that there were major deficiencies" in the education of staff members regarding EMTALA, hospital policies were "not in place or followed," signage was not available and "documentation of the risks and benefits of transfers were never made available to patients." (Docket Entry # 44, ¶ 52). "Plaintiff immediately started working on the education, policy creation, bylaw revision and signage issues raised by the [DPH]." (Docket Entry # 44, ¶ 53).

Around the same time period, "on or about April 2010, a nurse from Jordan Hospital's radiology laboratory informed plaintiff that a patient [("patient X")] had died from kidney failure as a result of improperly receiving dye during an MRI." (Docket Entry # 44, ¶ 57). After receiving that information, "plaintiff assembled a team to investigate the incident with patient X and produce an analysis [("root cause analysis")] to determine what medical and procedural errors occurred." (Docket Entry # 44, ¶ 58). "Plaintiff has 15 years of experience conducting root cause analysis and had never received any prior criticisms of her root cause analysis performance." (Docket Entry # 44, 59). In this particular incident, however, Sullivan criticized plaintiff "for the content of patient X's root cause

analysis." (Docket Entry # 44, ¶ 60).

"Upon information and belief, on May 18, 2010, an unnamed source from the DPH called Holden to alert him that CMS regulators would be arriving the following day for what was supposed to be an unannounced inspection of Jordan Hospital." (Docket Entry # 44, ¶ 62). On Wednesday, May 19, 2010, "CMS regulators arrived [at Jordan Hospital] to conduct the [DPH] survey." (Docket Entry # 44, ¶ 63). "Plaintiff attempted to meet with them to discuss the ER patient EMTALA violation as well as the death of patient X (Docket Entry # 44, ¶ 64)," but as plaintiff started to approach "the CMS regulators, [Sullivan] intervened and ordered [p]laintiff to go back to her office." (Docket Entry # 44, ¶ 65). Sullivan "would not allow plaintiff to speak with the CMS regulators." (Docket Entry # 44, ¶ 65).

Shortly after the CMS regulators' arrival, "and before plaintiff was interviewed by any CMS regulator regarding the [ER patient] EMTALA violation," Kirkwood and Kowaloff asked to meet with plaintiff. (Docket Entry # 44, ¶ 66). They notified plaintiff that "she was being terminated." (Docket Entry # 44, ¶ 67). "Kowaloff informed plaintiff that the reason for her dismissal was 'regulatory.'" (Docket Entry # 44, ¶ 68).


## DISCUSSION

Defendants seek dismissal of the amended complaint in its

entirety as to defendants Holden, Sullivan, Kirkwood and Kowaloff ("the new individual defendants") and counts III, IV, V and VI as to Jordan Hospital because these claims fail on the merits. In the alternative, defendants argue that this court must uphold the court's December 13, 2010 ruling ("district judge's ruling") on Jordan Hospital's and the individual defendants' motions to dismiss since that ruling is the law of the case. Defendants request that this court return the case to the original posture, i.e., before plaintiff amended the complaint to revive the dismissed claims, which would leave Jordan Hospital as the only defendant and counts I and II as the only claims. Defendants' law of the case argument overlooks this court's allowance of the motion to correct the December 13, 2010 docket entry. That ruling however was made without the benefit of an opposition from plaintiff thus contributing to the presence of an inadequate record.[12] In any event, defendants are correct that the claims

_____

[12] Plaintiff's failure to address, respond to or reference the law of the case doctrine waives her ability to rely on it. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (court cannot be expected to do counsel's work); see Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see, e.g, In re Pharmaceutical Industry Average Wholesale Price Litigation, 588 F.3d 24, 31 (1st Cir. 2009) ("district court properly held that anything raised in [prior] pleading that Howe did not explain in the reply brief was waived"); see generally U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4 (c)(2), and has waived the argument").

they challenge fail on the merits.  Addressing the challenged
claims seriatim, this court turns to counts I and II.


I.  Counts I and II

     Defendants argue that this court should dismiss counts I and
II as against the new individual defendants because both EMTALA
and HPWS only authorize suits against hospitals, not individuals.
Relying on Fotia v. Palmetto Behavioral Health, 317 F.Supp.2d 638
(D.S.C. 2004), plaintiff counters that EMTALA's terms are broadly
construed thereby allowing suits against individual defendants.

     The majority of courts conclude that EMTALA claims cannot be
brought against individual defendants.  See Millan v. Hospital
San Pablo, 389 F.Supp.2d 224, 235 (D.P.R 2005) ("[a]lthough the
First Circuit Court of Appeals has yet to resolve this the [sic]
controversy, it must be noted that other sister circuits have
uniformly decided the issue handily rejecting a cause of action
against physicians under EMTALA"); see, e.g., Lebron v. Ashford
Presbyterian Community Hospital, 995 F.Supp. 241, 244 (D.P.R.
1998); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1256 (9th
Cir. 1995); King v. Ahrens, 16 F.3d 265, 271 (8th Cir. 1994);
Baber v. Hospital Corporation of America, 977 F.2d 872, 877 (4th
Cir. 1992) ("the statute's legislative history demonstrates that
Congress intended to limit the patient's right to recover damages
for violations of EMTALA to suits against hospitals"); Delaney v.

Cade, 986 F.2d 387, 393 (10th Cir. 1993); Alvarez-Torres v. Ryder Memorial Hospital, Inc., 576 F.Supp.2d 278, 285 (D.P.R. 2008) ("[t]he civil enforcement provision of EMTALA applies only to participating hospitals, not physicians").  Adhering to the foregoing case law, plaintiff's EMTALA claim fails on the merits as against the new individual defendants.

Plaintiff's reliance on Fotia to argue that individuals may be sued under EMTALA is misplaced since that case only addresses who can sue under EMTALA, not who can be sued.  Fotia v. Palmetto Behavioral Health, 317 F.Supp.2d at 644.  In Fotia, an employer fired an employee after the employee reported the employer's EMTALA violation.  Id. at 640.  The court held that the statute provides a private cause of action to "any individual" who suffers harm from its violation.  Id. at 642.  The plaintiff in Fotia did not bring a claim against any individual defendant, so consequently nothing in that opinion suggests that individual defendants may be sued under EMTALA.  Lopes v. Kapiolani Medical Center for Women & Children, 410 F.Supp.2d 939, 951 n.11 (D.Haw. 2005) ("Fotia did not find that the EMTALA creates a private right of action against private individuals; rather it simply found that the EMTALA provides whistleblowers with a private right of action against hospitals for retaliation").

As an alternative argument, defendants contend that the statutory language of EMTALA authorizes a private cause of action

20

only against hospitals and not individuals.  The relevant whistleblower protections section of EMTALA reads:  "A participating hospital may not penalize or take adverse action against a qualified medical person . . .."  42 U.S.C. § 1395dd(i).  EMTALA defines "participating hospital" as "a hospital that has entered into a provider agreement under section 1395cc of this title."  42 U.S.C. § 1395dd(e)(2).  Plaintiff does not allege that the new individual defendants have entered into such provider agreements.  Accordingly, plaintiff cannot sue them as "participating hospitals."  (Docket Entry # 44).

Turning to the HPWS claim, the statutory language also authorizes claims only against hospitals.  Section 187(b) of Massachusetts General Laws chapter 149 in relevant part states, "A health care facility shall not . . . take any retaliatory action."  HPWS defines "health care facility" as an entity or person "that employs health care providers."  The individual defendants are not alleged to "employ" anyone.  Indeed, the amended complaint specifically indicates that all individual defendants are employees not employers.  (Docket Entry # 44, ¶¶ 3-6).

In sum, because the new individual defendants cannot be sued under both EMTALA and HPWS, counts I and II are subject to dismissal against the individual defendants.

## II. Counts III and IV

In Count III, plaintiff alleges that defendants violated Article 10. (Docket Entry # 44, ¶ 79). Article 10 provides that no citizen of Massachusetts may be deprived of the enjoyment of his or her property without due process of law. Mass.Gen.Law Const. Pt. 1, Art. 10. Plaintiff asserts that she possessed a property interest in her continued employment and that defendants deprived her of that interest without cause and without due process when they terminated her employment. (Docket Entry # 44, ¶ 80). In Count IV, plaintiff alleges that defendants violated Article 16. (Docket Entry # 44, ¶ 83). Article 16 protects the rights of Massachusetts citizens to freedom of speech. Mass.Gen.Law Const. Pt. 1, Art. 16. Plaintiff contends that defendants discharged her in retaliation for speaking out about matters of public concern in violation of Article 16. (Docket Entry # 44, ¶ 84).

Defendants argue that plaintiff's constitutional claims fail for three reasons: (1) plaintiff does not allege any state action; (2) plaintiff's at-will employment is not a "constitutionally protected interest;" and (3) plaintiff does not bring these claims under the MCRA as required under Massachusetts law. (Docket Entry # 47, pp. 1-2). Plaintiff fails to offer any arguments in opposition to the motion to dismiss these constitutional claims. (Docket Entry # 50). The lack of state

action and plaintiff's at-will employment status obviate the need to address defendants' third argument.

A.  <u>State Action</u>

Defendants argue that plaintiff does not have a cause of action under articles 10 and 16 because of the absence of state action.  "Claims under the Massachusetts Constitution," including those brought under articles 10 and 16 of the MDR, "require a 'deprivation of rights fairly attributable to the State.'" <u>Delmonte v. Laidlaw Environmental Services, Inc.</u>, 46 F.Supp.2d 89, 97 (D.Mass. 1999); <u>see</u> <u>Edsall v. Assumption College</u>, 367 F.Supp.2d 72, 78 (D.Mass. 2005) (dismissing Article 10 claim for failure to allege state action); <u>see also</u> <u>Commonwealth v. Noffke</u>, 379 N.E.2d 1086, 1090 (Mass. 1978) (Article 16 "protect[s] the rights of free speech . . . from abridgment by government"). Guarantees under Article 16 "do not extend to the conduct here which occurred on the property of a private employer."  <u>Id.</u> Furthermore, "a private party's action or decision must be required by a rule of decision imposed by the state before that action or decision will be deemed state action."  <u>Lombard v. Eunice Kennedy Shriver Center for Mental Retardation, Inc.</u>, 556 F.Supp. 677, 679 (D.Mass. 1983).

Here, Jordan Hospital is not a state actor.  Indeed, plaintiff herself admits in the amended complaint that Jordan Hospital is a private corporation.  (Docket Entry # 44, ¶ 2).

23

Additionally, the new individual defendants are employees of a private employer and their termination of plaintiff is not alleged to be governed by any rule imposed by the state. Accordingly, the new individual defendants are also not state actors. See Lombard v. Eunice Kennedy Shriver Center for Mental Retardation, Inc., 556 F.Supp. at 679. Given the lack of state action as to the hospital and the new individual defendants, counts III and IV are subject to dismissal.

B. At-will Employment

Defendants additionally contend that at-will employment is not a protectable constitutional interest. Consequently, according to defendants, the due process claim under Article 10 (Count III) and the interference with freedom of speech claim under Article 16 (Count IV) fail. (Docket Entry # 48, pp. 9-10).

With respect to the Article 10 claim, plaintiff must allege sufficient facts to show that "defendants, (1) acting under color of state law, (2) deprived plaintiff of (3) a property interest, as defined by state law, (4) without satisfactory process." Welch v. Paicos, 66 F.Supp.2d 138, 163 (D.Mass. 1999). An at-will employee however does not have a property interest to continued employment that is protectable by due process. See King v. Town of Hanover, 116 F.3d 965, 969 (1st Cir. 1997) (affirming summary judgment in favor of the defendant on due process claim because the "[plaintiff] was an at-will employee

24

who could be dismissed at any time . . . [and had] no protected property interest in his employment"); see also Columbus v. Biggio, 76 F.Supp.2d 43, 55 (D.Mass. 1999) (dismissing state due process claim because "[a]s an at-will employee . . . [the plaintiff] has no protected property interest").

Plaintiff does not allege she had an employment contract with Jordan Hospital that removes her from the category of an at-will employee. Given the absence of a property interest in ongoing employment as an at-will employee, plaintiff therefore fails to allege a plausible Article 10 claim.

Turning to the free speech claim under Article 16, plaintiff must show an "'interference or attempted interference with any right secured by the Constitution or laws of either the United States or of the Commonwealth.'" Webster v. Motorola, Inc., 637 N.E.2d 203, 206 (Mass. 1994). "[C]ourts have . . . held that termination of employment does not constitute 'interference' with a constitutional right where there were grounds not to renew a contract for term or where the employee was at-will." Nolan v. CN8, the Comcast Network, 2010 WL 3749466, *3 (D.Mass. Sept. 21, 2010), aff'd, 656 F.3d 71 (1st Cir. 2011); see also Willits v. Roman Catholic Archbishop of Boston, 581 N.E.2d 475, 480 (Mass. 1991); see, e.g., Korb v. Raytheon Corp., 574 N.E.2d 370, 372 (Mass. 1991). An employer's termination of an employee for speaking out is not an interference of a constitutional right

because, "[a]lthough [the plaintiff] has a secured right to speak out on matters of public concern, and he has a right to express views with which [the employer] disagrees, he has no right to do so at [the employer's] expense." Korb v. Raytheon Corp., 574 N.E.2d at 372. Indeed, an at-will employee is "free to express whatever opinions he wishes," but the employer "need not pay him to do so." Id.

Likewise, plaintiff has the right to speak out and be transparent about Jordan Hospital's errors but Jordan Hospital, as the employer, is not required to pay plaintiff for the outspokenness and transparency about the errors. Nolan v. CN8, the Comcast Network, 2010 WL 3749466, at *3. Thus, even if defendants terminated plaintiff for expressing her views, the termination would not constitute interference or abridgement of plaintiff's constitutional right of free speech.

Plaintiff's status as an at-will employee therefore precludes her success on the claims under both Article 10 and Article 16. Accordingly, counts III and IV are subject to dismissal as against all defendants.

In sum, the Article 10 and Article 16 claims are not plausible because plaintiff fails to allege sufficient facts to show her "entitlement for relief" under those claims. Bell Atlantic v. Twombly, 550 U.S. at 555. Plaintiff's complaint does not allege any state action as required to bring claims under the

Massachusetts Constitution.  Plaintiff does not provide any facts
to show that she is not an at-will employee.  Thus, plaintiff
cannot claim she has a property interest in continued employment
with Jordan Hospital.  For those reasons, plaintiff cannot claim
that defendants violated her due process rights or interfered
with her freedom of speech.

III.  Counts V and VI

In addition, plaintiff asserts claims against defendants for
intentional and negligent infliction of emotional distress
respectively in counts V and VI.  Defendants argue that these
common law claims for personal injury are barred by the
exclusivity provision of the WCA ("the exclusivity provision").
Plaintiff counters that her claims are not preempted by the WCA
because the new individual defendants' actions were retaliatory
in nature and thus outside the scope of employment and against
the employer's interest.  (Docket Entry # 50, p. 8).

The WCA is the exclusive remedy for plaintiffs who suffer
injuries compensable under the WCA.  See Green v. Wyman-Gordon
Co., 664 N.E.2d 808, 813 (Mass. 1996).  In particular, the
exclusivity provision "'bars common law actions against employers
where:  (1) the plaintiff is shown to be an employee; (2) her
condition is shown to be a personal injury within the meaning of
the worker's compensation act; and (3) the injury is shown to

have arisen out of and in the course of her employment.'"
Columbus v. Biggio, 76 F.Supp.2d at 57 (quoting Brown v. Nutter,
McClennen, and Fish, 696 N.E.2d 953, 955 (Mass.App.Ct. 1998));
see Foley v. Polaroid Corp., 413 N.E.2d 711, 713-14 (Mass. 1980).

The WCA also "provides the exclusive remedy against
coemployees who engage in tortious conduct within the course of
their employment and in furtherance of the employer's interest."
Brown v. Nutter, McClennen, and Fish, 696 N.E.2d at 956.[13]  A
coemployee's actions which are motivated by a "private vendetta"
not related to the employer's interest however are not immunized
from common law suits by the WCA.  See Columbus v. Biggio, 76
F.Supp.2d at 57; O'Connell v. Chasdi, 511 N.E.2d 349, 351 (Mass.
1987); see also Brown v. Nutter, McClennen, and Fish, 696 N.E.2d
at 956 (coemployees "are not immunized from suit by the workers'
compensation act for tortious acts which they commit outside the
scope of their employment, which are unrelated to the interest of
the employer"); Bourbeau v. City of Chicopee, 445 F.Supp.2d 106,
117 (D.Mass. 2006) (intentional torts that do not further "the
interests of the employer are not barred by the WCA because they
are not accepted risk of doing business").  Personal injuries

---

[13]  "An employer may be vicariously liable for emotional distress
intentionally inflicted by one employee on another."  Green v.
Wyman-Gordon Co., 664 N.E.2d at 813.  Whether the employer is
directly or vicariously liable for the injuries, if the injuries
are compensable under the WCA, then the plaintiff is barred by
the WCA from bringing common law claims for those injuries.  Id.

within the meaning of and thus barred by the WCA include "negligence, assault and battery, false imprisonment, and negligent and intentional infliction of emotional distress." <u>Doe v. Purity Supreme, Inc.</u>, 664 N.E.2d 815, 818 (Mass. 1996); <u>see Foley v. Polaroid Corp.</u>, 413 N.E.2d at 714 (recognizing that "emotional distress arising out of employment was a personal injury under the act"); <u>see also Grant v. John Hancock Mutual Life Insurance Co.</u>, 183 F.Supp.2d 344, 365 (D.Mass. 2002).

Further, "an injury arises out of the employment if it arises out of the nature, conditions, obligations, or incidents of the employment, in other words, out of the employment looked at in any of its aspects." <u>Doe v. Purity Supreme, Inc.</u>, 664 N.E.2d at 819. Massachusetts courts use an "objective test" to determine whether an injury arises out of the course of employment. <u>See Mulford v. Mangano</u>, 636 N.E.2d 272, 276 (Mass. 1994). In applying this test, courts perform a "fact-intensive analysis." <u>Brown v. Nutter, McClennen, and Fish</u>, 696 N.E.2d at 956. Injuries arising out of the employment include emotional injuries arising from bona fide personnel actions, such as "transfer, promotion, demotion or termination." <u>Catalano v. First Essex Savings Bank</u>, 639 N.E.2d 1113, 1115 (Mass.App.Ct. 1994).

The 1986 amendment to the WCA, however, "provided that if the emotional disability arises out of a bona fide personnel

action, it is not compensable [under the WCA] unless it is the result of intentional infliction of emotional harm." Id. at 1116. Thus, the WCA expressly excludes compensation for emotional injuries resulting from negligent infliction of emotional distress arising out of bona fide personnel actions. Mullen v. Ludlow Hospital Society, 592 N.E.2d 1342, 1345 (Mass.App.Ct. 1992); Tennaro v. Ryder Systems, Inc., 832 F.Supp. 494, 500 (D.Mass. 1993). Moreover, injuries resulting from negligent infliction of emotional distress arising from bona fide personnel actions are not compensable under common law since "it would be a 'paradox to eliminate nonintentional infliction of emotional harm . . . as a workers' compensation claim but to allow such a claim through another door as a common law action.'" Catalano v. First Essex Savings Bank, 639 N.E.2d at 1116 (quoting Mullen v. Ludlow Hospital Society, 592 N.E.2d at 1343, in parenthetical); see also Acciavatti v. Professional Services Group, Inc., 982 F.Supp. 69, 77 (D.Mass. 1997) ("both the First Circuit and lower Massachusetts state courts have found that the preclusive effect of the [WCA] extends to claims for both negligent and intentional infliction of emotional distress").

     Furthermore, even if the termination was not a bona fide personnel action but rather a retaliatory termination, as plaintiff contends, the exclusivity provision nevertheless bars plaintiff's common law claims. Relevant case law indicates that

the WCA covers injuries resulting from retaliation, particularly

retaliation against whistleblowers.  In <u>Acciavati v. Professional</u>

<u>Services Group, Inc.</u>, the employer defendant terminated the

employee plaintiff for reporting the employer's contamination of

the drinking water supply to the City of Brockton's Department of

Public Works Commissioner.  <u>Acciavati v. Professional Services</u>

<u>Group, Inc.</u>, 982 F.Supp. at 72-73.  The court dismissed the

plaintiff's claims for intentional and negligent infliction of

emotional distress on the basis that the claims were barred by

the exclusivity provision of the WCA.  <u>Acciavati v. Professional</u>

<u>Services Group, Inc.</u>, 982 F.Supp. at 77.  Additionally, the court

in <u>Ahanotu v. Massachusetts Turnpike Authority</u>, 466 F.Supp.2d 378

(D.Mass. 2006) held that the plaintiff's tort claims for injuries

resulting from retaliatory termination, including claims for

negligent and intentional infliction of emotional distress, were

barred by the exclusivity provision.  <u>Ahanotu v. Massachusetts</u>

<u>Turnpike Authority</u>, 466 F.Supp.2d at 389.   In the case at bar,

plaintiff's common law claims in counts V and VI fall within the

reach of the exclusivity provision.  Plaintiff was an employee of

Jordan Hospital and experienced emotional injuries from a

termination, a bona fide personnel action that the WCA covers as

a compensable personal injury.[14]  Even if the termination was

---

[14]  As previously stated, injuries resulting from negligent
infliction of emotional distress arising from bona fide personnel
actions are not covered by the WCA and are not compensable in
common law actions.  <u>Catalano v. First Essex Savings Bank</u>, 639

retaliatory in nature, the WCA also cover injuries from such a retaliatory termination. Finally, plaintiff's injury resulting from the termination occurred during the course of her employment. Catalano v. First Essex Savings Bank, 639 N.E.2d at 1116 (stating that termination is considered a bona fide personnel action and that injuries arising from bona fide personnel actions are injuries arising out of and within the course of employment). The exclusivity provision therefore bars counts V and VI.

Plaintiff contends that the claims are not barred because the new individual defendants were motivated by a "private vendetta" and their actions were not in furtherance of the employer's interest. (Docket Entry # 50, p. 11). Plaintiff does not allege facts to support the contention. On the contrary, the facts alleged by plaintiff show that defendants terminated plaintiff to further the interest of Jordan Hospital by protecting its reputation. Plaintiff's report to the DPH regarding the EMTALA violation involving the ER patient damaged Jordan Hospital's reputation. (Docket Entry # 44, ¶ 50). Plaintiff was terminated soon after she made the report. Plaintiff admits that, "The lapse between when [she] reported the EMTALA violation and when she was summarily terminated is 'very close'" and "provides sufficient evidence of causality." (Docket

_____

N.E.2d at 1116.

Entry # 50, p. 9).

Furthermore, plaintiff "stated her intentions to inform the ER patient about the EMTALA violation once the CMS regulators completed the investigation." (Docket Entry # 44, ¶ 56). Plaintiff could have further damaged Jordan Hospital's reputation with such action. The new individual defendants therefore prohibited plaintiff from speaking to the CMS regulators and subsequently terminated plaintiff. "However distorted the [new individual] defendants' understanding of the proper performance of their duties may have been, [this court] cannot say that they were acting outside the scope of their employment" and not in furtherance of the employer's interest. <u>Fusaro v. Blakely</u>, 661 N.E.2d 1339, 1341 (Mass.App.Ct. 1996). Counts V and VI are therefore subject to dismissal.


<u>CONCLUSION</u>

In light of the foregoing discussion, the motion to dismiss the amended complaint (Docket Entry # 47) is **ALLOWED**. Therefore, only counts I and II against Jordan Hospital remain.


<u>/s/ Marianne B. Bowler</u>
**MARIANNE B. BOWLER**
United States Magistrate Judge