UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARGARET O'CONNOR,
     Plaintiff,

          v.                          CIVIL ACTION NO.
                                      10-11416-MBB

JORDAN HOSPITAL, PETER HOLDEN,
President and CEO, DEBORAH SULLIVAN,
WILLIAM KIRKWOOD, Vice President
of Organizational Development, and
HARVEY KOWALOFF, M.D.,
     Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 61)**

**June 17, 2013**

**BOWLER, U.S.M.J.**

     Pending before this court is a motion for summary judgment
filed by defendant Jordan Hospital ("Jordan Hospital").  (Docket
Entry # 61).  Plaintiff Margaret O'Connor ("plaintiff") opposes
the motion.  (Docket Entry # 65).  Jordan Hospital filed a
response to plaintiff's opposition.  (Docket Entry # 69).  After
conducting a hearing on October 23, 2013, this court took the
motion under advisement.

PROCEDURAL BACKGROUND

     The six count amended complaint asserts claims against
Jordan Hospital; Peter Holden ("Holden"), President and Chief

Executive Officer ("CEO") of Jordan Hospital; Deborah Sullivan
("Sullivan"), Senior Director of Clinical Reliability and
Patient Safety; William Kirkwood ("Kirkwood"), Vice President of
Organizational Development; and Harvey Kowaloff, M.D.
("Kowaloff"), Vice President and Chief Medical Officer
(collectively "defendants").  (Docket Entry # 44).  The amended
complaint contains the following counts:  violation of the
Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §
1395dd ("EMTALA") ("the EMTALA claim") (Count I); retaliation in
violation of the Healthcare Provider Whistleblower Statute,
Massachusetts General Laws chapter 149, section 187 ("HPWS")
("the HPWS claim") (Count II); violation of article ten of the
Massachusetts Declaration of Rights (Count III); violation of
article 16 of the Massachusetts Declaration of Rights (Count
IV); intentional infliction of emotional distress (Count V); and
negligent infliction of emotional distress (Count VI).  (Docket
Entry # 44).

Defendants filed a motion to dismiss which resulted in
dismissal of counts three, four, five and six and left Jordan
Hospital as the sole defendant in counts one and two.  (Docket
Entry # 56).  Therefore, the only claims at issue are the EMTALA
claim and the HPWS claim.  Jordan Hospital moves for summary
judgment on these remaining counts.  (Docket Entry # 61).
Plaintiff opposes the motion and contends that genuine issues of

material fact preclude summary judgment.  (Docket Entry # 65).

Jordan Hospital filed a reply to plaintiff's opposition

asserting that no genuine issues of material fact exist.

(Docket Entry # 69).


## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of

the pleadings and assay the parties' proof in order to determine

whether trial is actually required.'"  Davila v. Corporacion De

Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir.

2007).  It is appropriate when the summary judgment record shows

"there is no genuine issue of material fact, and the moving

party is entitled to judgment as a matter of law."  Rule 56(c),

Fed. R. Civ. P.  "A dispute is genuine if the evidence about the

fact is such that a reasonable jury could resolve the point in

the favor of the non-moving party."  American Steel Erectors,

Inc. v. Local Union No. 7, International Association of Bridge,

Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68,

75 (1st Cir. 2008).  "A fact is material if it carries with it

the potential to affect the outcome of the suit under the

applicable law."  Id.

Facts are viewed in favor of the nonmovant.  Noonan v.

Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  Factual

disputes, including those set out in footnotes in the factual

background, are resolved in plaintiff's favor.  See id.  "Where,
as here, the non-movant has the burden of proof and the evidence
on one or more of the critical issues in the case is not
significantly probative, summary judgment may be granted."
Davila v. Corporacion De Puerto Rico Para La Difusion Publica,
498 F.3d at 12; accord Clifford v. Barnhart, 449 F.3d 276, 280
(1st Cir. 2006) (if moving party makes preliminary showing, non-
moving party must "produce specific facts, in suitable
evidentiary form, to establish the presence of a trial worthy
issue" with respect to each element on which he "would bear the
burden of proof at trial").  "[I]n order to forestall summary
judgment, the record evidence must be 'sufficiently open-ended
to permit a rational fact finder to resolve the . . . issue in
favor of either side.'"  Brown v. United States, 557 F.3d 1, 5
(1st Cir. 2009).

Jordan Hospital and plaintiff submit Local Rule 56.1
statements of undisputed facts.  (Docket Entry ## 62 & 66).
Uncontroverted statements of fact in a Local Rule 56.1 statement
comprise part of the summary judgment record.  See Cochran v.
Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the
plaintiff's failure to contest date in Local Rule 56.1 statement
of material facts caused date to be admitted on summary
judgment); Stonkus v. City of Brockton School Department, 322
F.3d 97, 102 (1st Cir. 2003) (citing Local Rule 56.1 and deeming

admitted undisputed material facts that the plaintiff failed to controvert).

FACTUAL BACKGROUND

Plaintiff was employed by Jordan Hospital for over 38 years as a registered nurse and in various other healthcare positions relating to quality control.  (Docket Entry ## 66, p. 4 & 66-1, Ex. 1).  Starting in 2007 and following the arrival of Holden, Jordan Hospital's new president and CEO, Jordan Hospital began undergoing major personnel and organizational changes.  (Docket Entry ## 62, p. 5; 62-2, pp. 3-4; 62-4, pp. 2-3; 62-5, pp. 5-6 & 66-3, Ex. 14).  Plaintiff's role at Jordan Hospital consisted of two separate functions:  60 percent of her time was devoted to occupational health while the other 40 percent was dedicated to risk management.  (Docket Entry ## 62, p. 7; 62-2, p. 5; 62-3, p. 2; 62-4, p. 3; 62-7, p. 3 & 62-11, p. 2).  In September 2008 and November 2009, plaintiff received exemplary performance evaluations from Kowaloff, who supervised plaintiff's work in risk management.  (Docket Entry ## 62-45; 66-3, Ex. 19 & 66-5, Ex. 33).

In late 2009, following a decision by Jordan Hospital to outsource the occupational health business to an outside vendor, plaintiff was offered the newly created position of variance manager in the department of clinical reliability and patient

safety.  (Docket Entry ## 62, p. 8; 62-4, p. 5; 62-49; 66, p. 4
& 66-5, Ex. 31).  The position "builds on the role of a
traditional Risk Manager with expanded responsibility to oversee
the regulatory interface with the Department of Public Health
(DPH) and the Patient Complaint and Grievance function."
(Docket Entry ## 62-49 & 66-5, Ex. 31).  Plaintiff accepted the
position on January 4, 2010.[1]  (Docket Entry ## 62, p. 8; 62-12;
66, p. 4 & 66-1, Ex. 4).  In her new role, plaintiff was also
responsible for overseeing the transition of the occupational
health department from within Jordan Hospital to the outside
vendor.  (Docket Entry ## 62, p. 9; 62-17, p. 6; 62-31 & 66-4,
Ex. 22).

In or around late 2009 or early January 2010, the
Department of Public Health ("DPH") conducted an investigation
regarding the death of a patient treated at Jordan Hospital and
issued a report.  (Docket Entry # 66, p. 5).  In response, on or
about January 15, 2010, plaintiff drafted a letter to the
patient's son regarding his mother's death, which was to be
signed by Holden ("January draft letter").  (Docket Entry ## 66,

---

[1]  The parties dispute whether this position constituted a
demotion from plaintiff's former role.  Jordan Hospital argues
that the role of variance manager effectively demoted plaintiff
from her former position.  (Docket Entry ## 62, p. 8; 62-2, pp.
7-8; 62-8, p. 6; 62-11, p. 3; 62-16 & 62-18).  Plaintiff,
however, asserts that the new position was not a demotion due to
equal compensation in each position and acknowledges a different
but comparable reporting structure.  (Docket Entry ## 62-3, p.
17 & 66, p. 4).

p. 4 & 66-1, Ex. 5).  Holden criticized the content of the
letter and it was ultimately not sent to the patient's family.
(Docket Entry ## 62-5, p. 8; 66, p. 5 & 66-1, Ex. 2).

On or about February 9, 2010, Kowaloff sent a letter to
plaintiff addressing:  her responsibilities in the role of
variance manager; an offer to train plaintiff in any necessary
computer programs; and reports that plaintiff's attitude had
been "aggressive and less than collaborative of late" ("the
February letter").  (Docket Entry ## 62-31 & 66-4, Ex. 22).  In
the letter, Kowaloff also encouraged plaintiff to take notice of
the negative reports concerning her attitude and take steps to
improve in the future.  (Docket Entry ## 62-31 & 66-4, Ex. 22).

At approximately 8:00 a.m. on March 4, 2010,[2] Jordan
Hospital received a patient ("the Patient") in its emergency
room.  (Docket Entry ## 62, p. 4 & 66, p. 5).  The Patient was
six months pregnant[3] with twins and had a history of diabetes.
(Docket Entry ## 66, p. 5 & 66-2, Ex. 8).  The Patient

---

[2]  There is a dispute as to the date of this incident.  In
plaintiff's amended complaint, plaintiff identifies the date as
March 26, 2010, yet in plaintiff's statement of undisputed facts
the date identified is March 4, 2010.  (Docket Entry ## 44, ¶ 25
& 66, p. 5).  Jordan Hospital, in its answer, identifies the
date of the incident as March 4, 2010.  (Document # 57, ¶ 25).

[3]  Jordan Hospital disputes that the stage of the Patient's
pregnancy was six months.  Instead, Jordan Hospital submits that
the Patient was 30 weeks pregnant on the date that she arrived
at Jordan Hospital's emergency room.  (Docket Entry ## 57, ¶ 25
& 66-2, Ex. 8).

complained of abdominal pain and nausea.  (Docket Entry # 66-2, Ex. 8).  About two hours later the Patient was diagnosed with preterm active labor.  (Docket Entry #66-2, Ex. 8).  After this diagnosis was made, the Patient was transferred to South Shore Hospital without the approval of a Jordan Hospital attending physician.  (Docket Entry ## 62, p. 5 & 66, p. 5).  Upon arrival at South Shore Hospital, the Patient had one of her child's legs protruding into her vagina and an emergency cesarean section was performed.  (Docket Entry ## 66, p. 5 & 66-2, Ex. 8).  The second child delivered also experienced significant complications during labor.  (Docket Entry ## 66, p. 5 & 66-2, Ex. 8).

Two days after this incident a risk manager from South Shore Hospital called plaintiff to voice her concern that the Patient's transfer may have been improper and in violation of EMTALA.  (Docket Entry ## 62, p. 5 & 66, p. 6).  Plaintiff conducted an investigation into the incident and concluded that an EMTALA violation had occurred and reported it to senior management.  (Docket Entry # 66, p. 6).  Plaintiff met with Sullivan, Kowaloff and Holden to discuss reporting the EMTALA violation and the penalties and fines that Jordan Hospital could face.  (Docket Entry ## 62-4, p. 13 & 66, p. 6).  Following this meeting plaintiff drafted a self-report letter dated March 15, 2010, reporting the EMTALA violation to the Centers for Medicare

and Medicaid Services ("CMS"), which was signed by Holden and sent to CMS. (Docket Entry ## 62-1; 62-2, p. 11; 62-46; 66-2, Ex. 6 & 66-2, Ex. 10). In a letter dated March 19, 2010, South Shore Hospital also reported the EMTALA violation relating to Jordan Hospital's transfer of the Patient. (Docket Entry # 62-47).

Shortly after Jordan Hospital's self-report letter was submitted, DPH conducted a survey of Jordan Hospital, on behalf of CMS, to investigate EMTALA violations ("the March DPH survey"). (Docket Entry ## 62-2, pp. 12-13; 66, p. 6 & 66-2, Ex. 8). The survey concluded that Jordan Hospital's medical treatment and transfer of the Patient to South Shore Hospital violated EMTALA. (Docket Entry # 66-2, Ex. 8).

In the time following this EMTALA incident, plaintiff was repeatedly criticized by senior management regarding her performance in the variance manager position. (Docket Entry ## 62, pp. 12-17; 62-28; 62-29; 62-32 & 66-2, Ex. 7). On or about March 22, 2010, Kowaloff sent a letter to plaintiff criticizing plaintiff's angry attitude and passive aggressive behavior ("the March letter"). (Docket Entry ## 62-35 & 66-4, Ex. 28). The letter also proposed an improvement plan and threatened termination if plaintiff's performance did not improve. (Docket Entry ## 62-4, p. 10; 62-35 & 66-4, Ex. 28).

As of March 22, 2010, plaintiff's responsibility in overseeing the transition of the occupational health department to the outside vendor ended.  (Docket Entry ## 62-4, p. 9; 62-11, p. 9; & 66-4, Ex. 21).  Her role then became entirely dedicated to risk management.  (Docket Entry # 66-4, Ex. 21). Plaintiff's job responsibilities included reporting specimen labeling errors that occurred at Jordan Hospital.  (Docket Entry ## 62, p. 16 & 66, p. 7).  On April 21, 2010, plaintiff made a presentation about specimen labeling errors to the Patient Care Assessment Committee ("the PCA committee"), a committee charged with identifying potential care issues and remedying them. (Docket Entry ## 62, p. 16 & 66, p. 7).  Plaintiff's presentation was criticized for its content and lack of analysis and plaintiff was verbally reprimanded by Holden, Kowaloff and Sullivan.  (Docket Entry ## 62, p. 17; 62-2, p. 10; 62-3, pp. 16, 22 & 41-42; 62-4, pp. 12-13; 62-5, p. 4; 62-10, pp. 3-4 & 11-12; 62-11, pp. 15-17; 62-39; 66, p. 8; 66-1, Ex. 2 & 66-3, Ex. 14).

As variance manager, one of plaintiff's responsibilities was to conduct root cause analyses.  (Docket Entry ## 62-4, p. 11; 62-49 & 66-5, Ex. 31).  In early April 2010, a patient at Jordan Hospital ("Patient X") improperly received dye while undergoing an MRI and died from kidney failure as a result. (Docket Entry ## 62, p. 15; 62-3, pp. 20-21; 66, p. 8 & 66-3,

Ex. 12).  Plaintiff conducted a root cause analysis relating to the death of Patient X.  (Docket Entry ## 62, pp. 15-16 & 66-3, Ex. 12).  The quality, content and completeness of plaintiff's root cause analysis for Patient X were criticized by both Kowaloff and Sullivan.  (Docket Entry ## 62, pp. 15-16; 62-3, p.21; 62-4, p. 11; 62-10, p. 8; 62-11, p. 14 & 66-3, Ex. 12).

In April and May 2010, senior management discussed termination of plaintiff's employment at Jordan Hospital.  (Docket Entry ## 62, p. 17; 62-2, p. 13; 62-4, p. 15; 62-7, p. 6; 62-36; 62-40; 62-41; 62-42 & 66-4, Ex. 24).  On May 19, 2010, CMS regulators visited Jordan Hospital to conduct a validation survey as a result of the EMTALA violation reported in March 2010.  (Docket Entry ## 62-3, p. 23; 66, p.8; 66-3, Ex. 14 & 66-5, Ex. 36).  On that same day, plaintiff met with Kowaloff and Kirkwood.  (Docket Entry ## 62-4, p. 16 & 62-7, pp. 7-8).  At this meeting Kowaloff terminated plaintiff.  (Docket Entry ## 62-3, p. 25 & 62-4, pp. 16-17).  Kowaloff explained to plaintiff that the reason for her termination was "regulatory."  (Docket Entry ## 62-3, p. 11; 66-1, Ex.22).

## DISCUSSION

Jordan Hospital seeks summary judgment on the remaining claims in this action, counts one and two which consist of, respectively, the EMTALA claim and the HPWS claim.  (Docket

Entry # 61).  Plaintiff asserts that summary judgment is inappropriate because genuine issues of material fact remain. (Docket Entry # 65).  Specifically, plaintiff identifies the genuine issues of material fact as follows:  (1) whether Jordan Hospital's proffered reasons for plaintiff's termination are mere pretext; and (2) whether Jordan Hospital retaliated against plaintiff for reporting the EMTALA violation.  (Docket Entry # 66).  In its reply to plaintiff's opposition, Jordan Hospital argues that plaintiff failed to identify genuine issues of material fact and that plaintiff's allegations lack any factual basis.  (Docket Entry # 69).  Explicitly, Jordan Hospital contends that plaintiff did not report or disclose the EMTALA violation and therefore she is not a whistleblower under either EMTALA or HPWS.  (Docket Entry # 69).  Further, Jordan Hospital asserts that plaintiff was terminated for poor performance and not in retaliation for reporting or disclosing the EMTALA violation.  (Docket Entry # 69).

I.   The EMTALA Claim (Count I)

The provisions of EMTALA were enacted to prevent "patient dumping," a practice of refusing to treat uninsured patients. Dollard v. Allen, 260 F.Supp.2d 1127, 1131 (D.Wy. 2003) (citing Abercrombie v. Osteopathic Hosp. Founders Ass'n, 950 F.2d 676, 680 (10th Cir. 1991)).  EMTALA provides protection to "whistleblowers" to ensure that such persons are not penalized

or retaliated against for reporting violations of its terms.  42

U.S.C. § 1395dd(i).  The relevant portion of the statute states:

> A participating hospital may not penalize or take adverse
> action against a qualified medical person described in
> subsection (c)(1)(A)(iii) of this section or a physician
> because the person or physician refuses to authorize the
> transfer of an individual with an emergency medical
> condition that has not been stabilized or *against any*
> *hospital employee because the employee reports a violation*
> *of a requirement of this section*.

42 U.S.C. § 1395dd(i) (emphasis added).  The statute clarifies

that two types of persons can be categorized as whistleblowers:

(1) qualified medical persons or physicians that refuse to

approve a transfer of a patient that has not been stabilized;

and (2) hospital employees that report a violation of EMTALA.

See 42 U.S.C. § 1395dd(i).

Where the term "report" is not defined within EMTALA it is

appropriate to turn to its ordinary meaning.  See Schindler

Elevator Corp. v. U.S. ex. Rel. Kirk, 131 S.Ct. 1885, 1891

(2011); accord U.S. ex. rel. Conrad v. Abbott Laboratories,

Inc., 2013 WL 682740, *5 (D.Mass. Feb. 25, 2013).  "A 'report'

is 'something that gives information' or a 'notification' . . .

or 'an official or formal statement of facts or proceedings.'"

Schindler Elevator Corp. v. U.S. ex. Rel. Kirk, 131 S.Ct. at

1891 (quoting Webster's Third International Dictionary, p. 1925

(1986) and Black's Law Dictionary, p. 1300 (1990)).

Here, the parties agree that in EMTALA retaliation claims it is appropriate to look to precedent from retaliation cases under the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.[4] (Docket Entry ## 62 & 66); see Lopes v. Kapiolani Medical Center for Women & Children, 410 F.Supp.2d 939, 947 (D.Haw. 2005). A prima facie case under Title VII requires a plaintiff to prove, by a preponderance of the evidence, that: (1) she engaged in a protected activity; (2) the defendant knew of her involvement in the protected activity; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. See Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).

In retaliation cases, "'where elusive concepts such as motive or intent are at issue, summary judgment is appropriate

---

[4] Title VII cases may additionally refer to judicial precedents interpreting the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.; and the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 et seq. because "'interpreting one such statute [is] instructive in decisions involving another.'" Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 428 n.2 (1st Cir. 2000) (quoting Serapion v. Martinez, 119 F.3d 982, 985 (1st Cir. 1997) ("We regard Title VII, ADEA, ERISA, and FLSA as standing in pari passu")). Although Jordan Hospital does not explicitly agree to the use of Title VII precedent as the retaliation standard, in its memorandum it relies on precedent from the aforementioned retaliation statutes. (Docket Entry # 62). In addition, Jordan Hospital's memorandum sets forth the same burden shifting framework and prima facie retaliation elements as plaintiff. (Docket Entry # 62).

if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation.'" Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)). "Where, as in this case and in retaliatory cases generally, there is no direct evidence of the defendant's retaliatory animus," this court must focus on "whether the evidence as a whole is sufficient to make out a jury question as to pretext and [retaliatory] animus." Fennell v. First Step Designs, Ltd., 83 F.3d at 535 (affirming summary judgment for the defendant employer in Title VII retaliation claim) (citing Mesnick v. General Electric Co., 950 F.2d 816, 827 (1st Cir. 1991)); accord Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d at 431 (at the summary judgment stage, court's ultimate focus should be on whether, viewing the record as a whole and taking all inferences in favor of the plaintiff, the plaintiff raised a genuine issue of material fact as to whether termination was motivated by retaliation); Surprise v. Innovation Group, Inc., 2013 WL 598326, *5 (D.Mass. Feb. 14, 2013). Moreover, a plaintiff need not prove that retaliation was in fact the motive for the adverse action; a plaintiff only has to raise a genuine issue of material fact as to whether retaliation motivated the adverse employment action. See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d at 433.

For purposes of EMTALA, whistleblowing is a protected activity as set forth in part (i) of the statute.  See 42 U.S.C. § 1395dd(i).  Where an employer knows that an employee engaged in a protected activity and "thereafter takes some adverse action against the complaining employee does not, by itself, establish causation." Mole v. University of Massachusetts, 814 N.E.2d 329, 339 (Mass. 2004).  Further, "the mere fact that one event followed another is not sufficient to make out a causal link." Id. (internal quotations omitted).  "However, if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible." Mole v. University of Massachusetts, 814 N.E.2d at 339; see Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d at 433 (noting that inference of pretext is permissible where an employee had a strong record with the employer and problems only arose after engaging in protected activity); Mesnick v. General Elec. Co., 950 F.2d at 828 ("temporal proximity of an employee's protected activity to an employer's adverse action" provides circumstantial evidence that precludes summary judgment on a retaliation claim).  Thus, discharge or termination soon after an employee engaged in protected conduct is strongly suggestive of retaliation.  See Fennell v. First Step Designs, Ltd., 83

F.3d 535-36 (citing Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988)).

In order to affirmatively establish causation, "the termination [must be] very closely connected in time to the protected activity" otherwise "the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."  Mole v. University of Massachusetts, 814 N.E.2d at 341 (internal quotations omitted).  Notably, as the time between the protected activity and the adverse action becomes greater, the inference of retaliation "weakens and eventually collapses." Id.; see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (holding that the temporal proximity must be "very close").  "Where . . . adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity," it cannot easily be inferred that subsequent adverse actions taken after the employer acquires such knowledge are retaliatory in nature. Mole v. University of Massachusetts, 814 N.E.2d at 340; see, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. at 272; Hoeppner v. Crotched Mountain Rehabilitation Center, 31 F.3d 9, 14-16 (1st Cir. 1994).

Once the plaintiff has made out a prima facie case of retaliation, the burden is on the employer to articulate a nondiscriminatory reason for the dismissal.  See Dominguez-Cruz

v. Suttle Caribe, Inc., 202 F.3d at 430.  If the defendant can demonstrate a nonretaliatory reason for termination, then the burden shifts back to the plaintiff "to show that the employer's stated [nonretaliatory] reason was a pretext" for retaliation. Id.  Where a plaintiff sets out a prima facie case of retaliation and the issue turns to whether the employer's reason for termination is mere pretext, "courts must be particularly cautious about granting the employer's motion for summary judgment."  Id. at 433 (internal citation omitted).  "One way to show pretext is through such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and with or without the additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons."  Surprise v. Innovation Group, Inc., 2013 WL 598326, at *7 (internal quotations omitted); see Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d at 431-32 (reversing grant of summary judgment to employer in ADEA claim where employer presented inconsistent reasons for employee's termination).

Here, it is undisputed that at the time of the EMTALA violation, plaintiff was an employee of Jordan Hospital. (Docket Entry ## 62 & 66).  For plaintiff to fall within the

whistleblower provision of EMTALA, plaintiff must have reported a violation of EMTALA.  See 42 U.S.C. § 1395dd(i).  The parties dispute whether plaintiff reported the EMTALA violation and, thus, whether plaintiff was a whistleblower under the terms of EMTALA.  (Docket Entry ## 62 & 66).

It is undisputed that plaintiff was the one to receive the call from South Shore Hospital regarding a potential EMTALA violation.  (Docket Entry # 66, p. 5-6).  Plaintiff states that she took the lead in the investigation of this potential EMTALA violation.  (Docket Entry # 62-3, p. 9).  The parties do not dispute that plaintiff brought the EMTALA violation to the attention of senior management.  (Docket Entry # 66, pp. 5-6).  Plaintiff also prepared the reporting letter to be sent out to CMS.  (Docket Entry # 62-3, p. 13).  Based on this record, this court finds that plaintiff reported the EMTALA violation to her supervisors and prepared a report for CMS, a regulatory authority.  See 42 U.S.C. § 1395dd.  For purposes of summary judgment, therefore, plaintiff was a whistleblower under the provisions of EMTALA and accordingly entitled to protection from any retaliation by Jordan Hospital.

Here, viewing the record in plaintiff's favor, plaintiff has set forth prima facie evidence of retaliation.  She reported the EMTALA violation.  (Docket Entry # 62-3, p. 13 & 48).  The report is a protected activity under the whistleblower

provisions of EMTALA.  See 42 U.S.C. § 1395dd(i).  Plaintiff
first reported the EMTALA violation to senior management,
including Sullivan, Kowaloff and Holden, and then she drafted a
letter reporting the violation to CMS and submitted it to her
supervisors.  (Docket Entry ## 62-3, p. 13 & 48; 66-3, Ex. 2).
Thus, plaintiff's superiors were well aware of her engagement in
a protected activity.

It is undisputed that some time after reporting the EMTALA
violation, Jordan Hospital terminated plaintiff.  (Docket Entry
## 62 & 66).  This termination constituted an adverse employment
action.  See Surprise v. Innovation Group, Inc., 2013 WL 598326,
at *6.  Plaintiff was told that her termination was "regulatory"
and she believes it resulted from her report of the EMTALA
violation.  (Docket Entry # 62-3, p. 16 & 48).  The time between
the report of the EMTALA violation on March 15, 2010, and
plaintiff's termination on May 19, 2010, was approximately two
months.  (Docket Entry ## 62 & 66).  A jury could reasonably
find this temporal proximity alone sufficient to demonstrate a
causal connection between the report of the EMTALA violation and
plaintiff's termination.  See Mole v. University of
Massachusetts, 814 N.E.2d at 341 (citing cases).

In efforts to further demonstrate a causal connection
between the report of the EMTALA violation and plaintiff's
termination, she states that prior to her report of the EMTALA

violation, no disciplinary action had been instituted against her in all her years working at Jordan Hospital. (Docket Entry # 62-3, pp. 18-19, 27 & 53). She submits her performance evaluations for the years of 2008 and 2009 to indicate her positive record at Jordan Hospital. (Docket Entry ## 62-45; 66-3, Ex. 19 & 66-5, Ex. 33). In addition, plaintiff avers that after reporting the EMTALA violation she became infamous at Jordan Hospital as the one responsible for the follow up investigations conducted by CMS and DPH. (Docket Entry ## 62-3, pp. 7, 12, 16, 19, 27 & 47; 66-3, Ex. 12).

Jordan Hospital, however, presents evidence that plaintiff received criticism and multiple written warnings depicting her poor performance both before and after the EMTALA violation was reported. (Docket Entry # 62). To rebut plaintiff's claims, Jordan Hospital submits multiple affidavits and depositions of employees at Jordan Hospital which state that plaintiff had multiple behavioral and performance problems before the EMTALA violation and that these were the reasons for her termination. (Docket Entry ## 62-1; 62-4; 62-5; 62-6; 62-7; 62-8; 62-9; 62-10; 62-11; 62-17 & 62-38). Plaintiff claims that Jordan Hospital's proffered reasons for her termination are mere pretext. (Docket Entry # 66).

Here, Jordan Hospital shows that plaintiff received negative feedback from Holden on the January draft letter within

her first month in the role of variance manager.  (Docket Entry
## 62-5, p. 8; 66, p. 5 & 66-1, Ex. 2).  Plaintiff interprets
Holden's criticism as his opposition to her approach of
transparency in interacting with patients and patients'
families.  (Docket Entry # 62-3, pp. 33-34).  This dispute
should be left to a jury to assess the credibility of Holden and
plaintiff in order to determine the weight of Holden's early
criticism.  See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d
at 431.

    Next, Jordan Hospital indicates that the February letter
constituted plaintiff's first "written warning".  (Docket Entry
## 62, 62-35 & 66-4, Ex. 28).  Plaintiff, however, maintains
that the February letter was not a reprimand but merely a
summary of what they had discussed at a meeting.  (Docket Entry
#& 62-3, p. 19; 62-31 & 66-4, Ex. 22).  While the February
letter does reference plaintiff's "aggressive and less than
collaborative" attitude, it also acknowledges the difficulties
plaintiff faced in her dual role at Jordan Hospital prior to the
transition of the occupational health department to the outside
vendor.  (Docket Entry ## 62-31 & 66-4, Ex. 22).  If entered
into evidence, a reasonable jury could interpret the February
letter as plaintiff did rather than as a written warning or
reprimand.  Undoubtedly, when comparing the February letter to
the March letter, which plaintiff received from Kowaloff after

the EMTALA violation was reported, the February letter is congenial and cordial whereas the March letter threatens termination.  (Docket Entry ## 62-31; 62-35; 66-4, Ex. 22 & 66-4, Ex. 28).

The January draft letter and the February letter are crucial to Jordan Hospital's claims that plaintiff's poor performance was the reason for her termination.  The majority of documents that Jordan Hospital presents as the basis for plaintiff's poor performance in the variance manager role postdate the report of the EMTALA violation.  For instance, plaintiff's alleged poor performance relating to the PCA committee presentation and the root cause analysis of Patient X occurred after the EMTALA violation was reported.  (Docket Entry ## 62, pp. 15-16; 62-3, pp. 20-21; 66, pp. 7-8 & 66-3, Ex. 12). Thus, a jury could infer that these later incidents were merely a pretext to cover Jordan Hospital's retaliation against plaintiff for reporting the EMTALA violation.  Without the January draft letter and the February letter, Jordan Hospital's evidence substantially relies on the depositions and affidavits of present and former Jordan Hospital employees.  Where these depositions and affidavits conflict with plaintiff's own deposition testimony, credibility issues arise which are the province of the jury.  See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d at 431.

At the summary judgment stage, viewing the evidence as a whole and avoiding credibility assessments, the evidence in this case supports an inference of pretext.  While the termination of plaintiff's employment may prove to have been for reasons other than retaliation for reporting the EMTALA violation, the record sufficiently raises genuine issues of material fact that should be left to the jury.  Therefore, summary judgment is denied as to Count I because plaintiff raises genuine issues of material fact regarding whether Jordan Hospital terminated plaintiff in retaliation for her reporting the EMTALA violation.

II.   The HPWS Claim (Count II)

Jordan Hospital also seeks summary judgment on Count II and argues that plaintiff is not a whistleblower afforded protection under HPWS and that plaintiff was terminated for poor performance and behavior, not in retaliation for disclosing or threatening to disclose the EMTALA violation.  (Docket Entry # 62).  Plaintiff contends that summary judgment on this count is inappropriate because genuine issues of material fact exist relating to whether plaintiff's termination was retaliatory.  (Docket Entry # 66).  Plaintiff sets forth claims under HPWS, specifically identifying sections (b)(1) and (b)(3) of the statute.  (Docket Entry # 66).  Thus, plaintiff alleges that she disclosed or threatened to disclose what she reasonably believed were violations of law committed by Jordan Hospital and that she

objected to or refused to participate in a policy, practice or procedure which she reasonably believed to be in violation of the law.  (Docket Entry # 66).  Plaintiff claims that Jordan Hospital violated the following laws:  (1) EMTALA, 42 U.S.C. § 1395dd(c)(1)(A)(iii);[5] (2) section 130.331 of Title 105 of the Code of Massachusetts Regulations ("105 CMR § 130.331");[6] and (3) section 130.332 of Title 105 of the Code of Massachusetts Regulations ("105 CMR § 130.332").[7]  Jordan Hospital asserts that there are no genuine issues of material fact precluding summary judgment.  (Docket Entry # 69).  Further, Jordan Hospital argues that plaintiff did not object to or disclose any violations of law on the part of Jordan Hospital.  (Docket Entry # 69).

---

[5]  A violation of EMTALA occurs if a patient with an emergency medical condition is transferred without the approval of a physician.  See 42 U.S.C. § 1395dd(c)(1)(A)(iii).

[6]  A violation of 105 CMR § 130.331 occurs if a hospital does not report, within seven days, any "[d]eath that is unanticipated, not related to the natural course of the patient's illness or underlying condition, or that is the result of an error or other incident as specified in guidelines of the Department . . .."  105 CMR § 130.331.

[7]  A violation of 105 CMR § 130.332 occurs if a hospital does not report the occurrence of a serious reportable event within seven days.  See 105 CMR § 130.332(B)(1).  A serious reportable event is defined as "an event that occurs on premises covered by a hospital's license that results in an adverse patient outcome, is clearly identifiable and measurable, has been identified to be in a class of events that are usually or reasonably preventable, and of a nature such that the risk of occurrence is significantly influenced by the policies and procedures of the hospital."  105 CMR § 130.332(A).

Like EMTALA, HPWS protects whistleblowers from retaliatory
action taken against them by health care facilities.  See Mass.
Gen. L. ch. 149, § 187.  HPWS is specific to the health care
industry and its purpose is "'to safeguard patient care by
protecting the rights of health care providers who expose
deficiencies in care that violate laws or regulations or
professional standards that endanger public health.'"
Dermesropian v. Dental Experts, LLC, 718 F.Supp.2d 143, 150 n.1
(D.Mass. 2010) (quoting Commodore v. Genesis Health Ventures,
Inc., 824 N.E.2d 453, 460 (Mass.App.Ct. 2005)); accord Oulton v.
Brigham & Women's Hosp., 2013 WL 1283384, *4 (D.Mass. Mar. 29,
2013) (dismissing HPWS claim where plaintiff's objections did
not relate to patient safety).  Specifically the statute
provides that:

> A health care facility shall not refuse to hire, terminate
> a contractual agreement with or take any retaliatory action
> against a health care provider because the health care
> provider does any of the following:
>
> (1) *discloses or threatens to disclose to a manager or to a
> public body* an activity, policy or practice of the health
> care facility or of another health care facility with whom
> the health care provider's health care facility has a
> business relationship, that the health care provider
> *reasonably believes is in violation of a law* or rule or
> regulation promulgated pursuant to law or violation of
> professional standards of practice which the health care
> provider reasonably believes poses a risk to public health
> . . .
>
> (3) *objects to or refuses to participate in* any activity,
> policy or practice of the health care facility or of
> another health care facility with whom the health care

> provider's health care facility has a business relationship
> which the health care provider *reasonably believes is in
> violation of a law* or rule or regulation promulgated
> pursuant to law or violation of professional standards of
> practice which the health care provider reasonably believes
> poses a risk to public health . . ..

Mass. Gen. L. ch. 149, § 187(b) (emphasis added).[8]  A "health

care provider" as defined by HPWS is:

> an individual who is a licensed health care provider under
> the provisions of chapter 112 including, but not limited
> to, *registered nurses*, licensed practical nurses,
> physicians, physician assistants, chiropractors, dentists,
> occupational therapists, physical therapists, optometrists,
> pharmacists, podiatrists, psychologists and social workers
> or *any other health care provider who performs or has
> performed health care related services* for and under the
> control of a health care facility for care-related
> services.

Mass. Gen. L. ch. 149, § 187(a) (emphasis added).

Thus, under section (b)(1), HPWS affords protection from

retaliation to a "health care provider" that "discloses or

threatens to disclose" a violation of law to supervisors or to a

regulatory authority.  Mass. Gen. L. ch. 149, § 187(b)(1).

Alternatively:

> A claim under [section] 187(b)(3) requires the plaintiff to
> establish that (1) she objected to, or refused to
> participate in, an activity, policy or practice that (2)
> she reasonably believed to be in violation of a law, rule,
> regulation or professional standard of practice, (3) which
> she reasonably believed posed a risk to public health, and
> (4) she was retaliated against as a result.

---

[8]   The language used in HPWS "largely tracks the language of
the Massachusetts whistleblower statute, which is not limited to
health care providers."  <u>Romero v. UHS of Westwood Pembroke,
Inc.</u>, 893 N.E.2d 355, 359 n. 2 (Mass.App.Ct. 2008).

Romero v. UHS of Westwood Pembroke, Inc., 893 N.E.2d at 359 (affirming grant of summary judgment to defendant health care facility on HPWS claim).  The objection or refusal must be "'a substantial or motivating part' of the adverse employment action."  Id. at 359 n.4; see also Welch v. Ciampa, 542 F.3d 927, 942-43 (1st Cir. 2008) (reversing grant of summary judgment to defendant employer under parallel Massachusetts whistleblower statute, section 185 of chapter 149 of Massachusetts General Laws ("the Massachusetts whistleblower statute")).

Under HPWS, a plaintiff's belief that a health care facility is acting in violation of a law must be objectively reasonable.  See id. at 359 n.3 (citing Lynch v. Boston, 180 F.3d 1, 17 (1st Cir. 1999) (interpreting the Massachusetts whistleblower statute)).  To withstand summary judgment, plaintiff must "put forward sufficient material to demonstrate that she voiced an objection."  Romero v. UHS of Westwood Pembroke, Inc., 893 N.E.2d at 359 n.6 (citing Lyon v. Morphew, 678 N.E.2d 1306, 1308 (Mass. 1997)).  HPWS refers only to "existing activities, policies and practices of a health care facility that are . . . in violation of a statute, rule, regulation or a professional standard."  Romero v. UHS of Westwood Pembroke, Inc., 893 N.E.2d at 359.

Here, it is undisputed that Jordan Hospital is a health care facility as defined in HPWS.[9]  (Docket Entry ## 62 & 66). Instead, Jordan Hospital argues that plaintiff is not covered under HPWS by alleging that she does not meet the definition of a "health care provider."  (Docket Entry # 62).  Jordan Hospital relies on the job description of variance manager to determine that plaintiff did not act as a health care provider while employed at Jordan Hospital.  (Docket Entry ## 62; 62-49 & 66-5, Ex. 31).  Plaintiff admits that she played a part in writing the job description herself.  (Docket Entry # 62-3, p. 17).  Jordan Hospital's sole reliance on the job description, however, is misplaced in determining whether plaintiff was a health care provider under HPWS.  Plaintiff states that she was a health care provider because she is a registered nurse and part of her job at Jordan Hospital involved providing nursing care.  (Docket Entry # 62-3, pp. 29-31).  In light of plaintiff's deposition testimony and Jordan Hospital's lack of evidence contesting plaintiff's testimony, this court readily finds for purposes of summary judgment that plaintiff was a health care provider covered by HPWS.

As detailed above in section I, plaintiff disclosed the

---

[9]  The statute includes "any hospital" within the definition of a health care facility.  Mass. Gen. L. ch. 149, § 187(a).

EMTALA violation to her supervisors[10] and also drafted a letter to disclose the violation to a "public body."[11]   In its follow up investigation to the report of the EMTALA violation, DPH found that an EMTALA violation had occurred in violation of 42 U.S.C. § 1395dd(c)(1)(A)(iii).  (Docket Entry # 66-2, Ex. 8).  Thus, as a violation of law pertaining to examination and treatment of patients, plaintiff could reasonably believe such violation posed a risk to public safety.  Indeed, the EMTALA violation arose from the transfer of the Patient without a physician's approval.  Such approval was required to ensure that the Patient was stabilized prior to any transfer and evidences concern for public safety.

Here, following plaintiff's disclosure of the EMTALA violation to her supervisors and to a public body, plaintiff states that her work environment changed dramatically and that she was constantly targeted because of her disclosure.  (Docket Entry # 62-3, pp. 7, 12, 16, 19, 26 & 32).  Jordan Hospital, however, asserts that plaintiff's poor performance and

---

[10]   Plaintiff's supervisors are "managers" under the terms of HPWS which defines a manager as, "an individual to whom a health care facility has given the authority to direct and control the work performance of the affected health care provider, who has authority to take corrective action regarding a violation of a law . . .."  Mass. Gen. L. ch. 149, § 187(a).

[11]   A regulatory authority, such as CMS and DPH, constitutes a "public body" as defined in HPWS.  Mass. Gen. L. ch. 149, § 187(a).

behavioral issues began before any such disclosure was made. (Docket Entry # 62).

Whether Jordan Hospital retaliated against plaintiff for disclosing the EMTALA violation is analyzed in detail in section I. Viewing the record as a whole, and for the reasons set forth in section I, there is sufficient evidence permitting an inference that Jordan Hospital retaliated against plaintiff for her disclosure and that the reasons Jordan Hospital asserts for plaintiff's termination are mere pretext. See Welch v. Ciampa, 542 F.3d at 942-43. Again, as explained above in section I, although termination of plaintiff's employment may have been for reasons other than retaliation for reporting the EMTALA violation, the record sufficiently raises genuine issues of material fact that should be left to the jury. See Delaney v. Massachusetts Bay Transit Authority, 2013 WL 2443992, *2-3 (D.Mass. June 5, 2013) (denying dismissal of Massachusetts whistleblower claim where disclosure of the violation was disputed).

Here, plaintiff additionally claims that Jordan Hospital violated 105 CMR §§ 130.331 and 130.332 and that her objections to, or disclosure of, these violations resulted in her termination. (Docket Entry # 66). These violations occurred in the context of Jordan Hospital's treatment of Patient X. (Docket Entry # 66). Plaintiff contends that because Patient

X's death was not reported to the appropriate regulatory authorities within the statutorily mandated seven day period, Jordan Hospital violated 105 CMR §§ 130.331 and 130.332. (Docket Entry # 66).  Although plaintiff claims she intended to disclose these violations, she offers no evidence that she made her supervisors aware of her intended disclosure beyond her own testimony.  (Docket Entry # 62-3, pp. 28 & 49).  Moreover, plaintiff's own testimony contradicts itself and states that plaintiff believes the reason for her termination was solely based on her disclosure of the EMTALA violation and not any later violations.  (Docket Entry # 62-3, pp. 19, 26-27 & 47-48).

Thus, without the awareness of Jordan Hospital's senior management that plaintiff disclosed, threatened to disclose or objected to these violations, there is no evidence in the record indicating that any such disclosure or objection contributed to her termination.  Without this causal link, plaintiff's claimed violations of 105 CMR §§ 130.331 and 130.332 cannot be connected to the alleged retaliation.  Cf. Bolduc v. Town of Webster, 629 F.Supp.2d 132, 154 (D.Mass. 2009) (denying summary judgment where there was evidence connecting the plaintiff's disclosure of a violation of law to the alleged retaliation).

CONCLUSION

In accordance with the foregoing discussion, the motion for summary judgment (Docket Entry # 61) for Count I is **DENIED.** Summary judgment for Count II is **DENIED** as to the EMTALA violation and **ALLOWED** as to the violations of 105 CMR §§ 130.331 and 130.332 in accordance with the above discussion. Accordingly, the parties shall appear for a status conference on July 9, 2013, at 2:30 p.m. to set a trial date.

                                    __/s/ Marianne B. Bowler____
                                    **MARIANNE B. BOWLER**
                                    United States Magistrate Judge